[No. G046081. Fourth Dist., Div. Three. Jan. 18, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
TIEN DUC NGUYEN, Defendant and Appellant.

1312

**COUNSEL**

Davis & Associates and Jason A. Davis for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOORE, J.**—Beware of the dangers of the Internet. It makes semiautomatic assault weapon kits available at the click of a mouse. Furthermore, it would appear to provide guidance on assembling the weapons, as well as suggestions for avoiding criminal convictions arising out of the possession of the parts, their assembly, and even the possession of the completed weapons. But woe betide the consumer who trusts every scheme espoused on the Internet.

Defendant Tien Duc Nguyen (defendant) was caught making an AK-47 from a kit. He was convicted of attempted unlawful assault weapon activity and attempted possession of an assault weapon (Pen. Code, § 664, subd. (a), former § 12280, subds. (a)(1), (b), repealed by Stats. 2010, ch. 711, § 4). Defendant appeals. He insists the statutory scheme will not support a conviction until the AK-47 is fully assembled and enables the shooter to fire repeated shots without reloading manually. Defendant fails to distinguish between the violation of Penal Code former section 12280, subdivisions (a)(1) and (b),[1] on the one hand, and the attempted violation of those statutes, on the other hand. We affirm.

### I

### FACTS

#### A. *Background*

Defendant was the owner of an auto repair shop. On March 17, 2010, Police Officer Brian Chapman, on assignment as a detective with the Orange County Auto Theft Task Force, went to defendant's business premises. Chapman informed defendant that he and other detectives in attendance intended to search the premises. As a matter of standard procedure, Chapman asked defendant if he had any weapons on site. Defendant responded that he had a hunting rifle he used for shooting pigs.

Defendant led Chapman to a fully assembled .50-caliber DTC rifle. According to Chapman, the rifle was not one that would typically be used for

---

[1] All subsequent statutory references are to the Penal Code unless otherwise specifically stated.

pig hunting. Rather, he expressed the opinion that "even calling it an elephant gun would be an understatement."

Chapman noticed that the rifle did not have a serial number or manufacturer name on it, so he asked defendant about it. Defendant explained to Chapman "that he had purchased the lower portion of the rifle that would typically have the serial numbers and manufacturing name off the Internet." Defendant further explained that the lower portion of the rifle, or the receiver, was not completed when he purchased it. He had to "machine it" or drill holes in it in order to finish it. Defendant stated that he had completed the drilling process and put the pieces of the rifle together himself. Chapman dry fired the rifle and determined that it ought to be in good working order.

Defendant also took Chapman to some .50-caliber DTC ammunition—the ammunition that went with the rifle. In addition, he showed Chapman some .50-caliber Beowulf ammunition. Defendant explained that the .50-caliber Beowulf ammunition went with a different rifle he had rented for pig hunting.

After that, Chapman asked defendant if he had any other weapons, and defendant told him he was building an AK-47. Defendant took Chapman to a box of AK-47 parts. Again, the receiver had no serial number or manufacturer name. Defendant explained that he had purchased an AK-47 flat receiver, and he opined that when one purchases an AK-47 flat receiver that has yet to be bent into shape, one does not have to register the firearm. He pulled up the AK-Builder.com Web site on his computer and showed Chapman the AK-47 flat receivers for sale. Defendant had already bent his flat receiver into shape for assembly, by using a vise or a flat bending die set.

Chapman asked defendant if he knew it was wrong for him to have and make his own AK-47. Defendant admitted knowing it was wrong.

Chapman said he met with Rocky Edwards, of the Santa Ana Police Department forensics services department. The two of them went through the box of parts and compared them to an AK-47 diagram and checked to make sure all the parts of an AK-47 were present, which appeared to be the case. He also met with Sergeant Greg Schuch of the Orange County Sheriff's Department, and the two of them compared the box of parts to the parts of a working AK-47. Having done so, Chapman opined that all the parts necessary to build a working AK-47 were present. Indeed, defendant himself acknowledged having all the necessary parts. It appeared to Chapman that at least one more hole needed to be drilled into the receiver before the weapon could be completed.

B. *Charges*

Defendant was accused of attempted unlawful assault weapon activity (§ 664, subd. (a), former § 12280, subd. (a)(1)), attempted possession of an assault weapon (§ 664, subd. (a), former § 12280, subd. (b)), possession of a firearm by a felon (former § 12021, subd. (a)(1), repealed by Stats. 2010, ch. 711, § 4), and possession of ammunition by a prohibited person (former § 12316, subd. (b)(1), repealed by Stats. 2010, ch. 711, § 4). It was also alleged, pursuant to section 667, subdivisions (d) and (e)(1) and section 1170.12, subdivisions (b) and (c)(1), that defendant was previously convicted of a serious and violent felony—a violation of former section 12025, subdivisions (a)(1) and (b)(3) (repealed by Stats. 2010, ch. 711, § 4).

He entered a guilty plea as to the third and fourth counts. He recited: "In Orange County, California, on March 17, 2010, having previously been convicted of a felony, I did own, purchase, receive, possess & have in my custody & control a firearm and ammunition & I knew I was prohibited from owning & possessing a firearm pursuant to Penal Code Sections 12021 & 12021 [*sic*] & Welfare & Institutions Code Sections 8100 & 8103." In addition, defendant admitted a prior conviction for violation of former section 12025, subdivisions (a)(1) and (b)(3).

The jury found defendant guilty of the first and second counts. The court sentenced defendant to a term of six years in state prison on the first count and stayed the sentence on the second count. It sentenced him to a term of four years on each of the third and fourth counts, with each sentence to be served concurrently to the sentence for the first count.

II

DISCUSSION

A. *Right to Possess Unassembled Parts*

Defendant first argues that the applicable statutory scheme permitted him to legally possess the unassembled parts of the AK-47 and that it was error to convict him of any crime under the first and second counts. In evaluating that argument, we turn to the statutes in question.

(1) *Roberti-Roos Assault Weapons Control Act of 1989*

Section 12275 et seq., as in effect at the time of sentencing, is known as the Roberti-Roos Assault Weapons Control Act of 1989 and the .50 Caliber

BMG Regulation Act of 2004 (AWCA).[2] The purpose of that act was set forth in section 12275.5, subdivision (a), as follows: "The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings. It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities." (Former § 12275.5, subd. (a).)

Section 12280, subdivision (a)(1) provided in pertinent part: "(a)(1) Any person who, within this state, manufactures or causes to be manufactured . . . any assault weapon . . . is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for four, six, or eight years." (Former § 12280, subd. (a)(1).) Section 12280, subdivision (b) provided in pertinent part: "Any person who, within this state, possesses any assault weapon . . . shall be punished by imprisonment in a county jail for a period not exceeding one year, or by imprisonment in the state prison. . . ." (Former § 12280, subd. (b).)

Several different statutes identify firearms that are classified as "assault weapons" for the purposes of the AWCA. One such statute was section 12276. Subdivision (a)(1) thereof defined the term "assault weapon" to include all "AK series" rifles, including without limitation certain AK-47's specified by manufacturer. Subdivision (e) thereof provided: "The term 'series' includes all other models that are only variations, with minor differences, of those models listed in subdivision (a), regardless of the manufacturer." (Former § 12276, subd. (e).) Another such statute was section 12276.5. Subdivision (b)(1) thereof required the Attorney General, until January 1, 2007, to promulgate a list containing certain additional firearms designated as "assault weapons." A third statute was section 12276.1, which described a generic "assault weapon" by general characteristics.

---

[2] Operative January 1, 2012, the AWCA was renumbered and set forth in section 30500 et seq. (Stats. 2010, ch. 711, §§ 4, 6.) Throughout this opinion we shall refer to the code sections that were in effect at the time of sentencing, consistent with the usage by the parties. For the convenience of the reader, we will hereafter omit to refer to repealed Penal Code provisions as "former" code sections, except in parenthetical citations.

Section 12276.1 is the statute at issue before us. Subdivision (a)(1) thereof provided that the term "assault weapon" also included "[a] semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following: [¶] (A) A pistol grip that protrudes conspicuously beneath the action of the weapon. [¶] (B) A thumbhole stock. [¶] (C) A folding or telescoping stock. [¶] (D) A grenade launcher or flare launcher. [¶] (E) A flash suppressor. [¶] (F) A forward pistol grip." (Former § 12276.1, subd. (a)(1).)

### (2)  *Unassembled weapons*

#### (a)  *Definition of "semiautomatic"*

As is readily apparent, section 12276.1, subdivision (a)(1) did not expressly state whether a semiautomatic centerfire rifle must be fully assembled and operational in order to be characterized as an assault weapon. Defendant thinks the answer is obvious and claims the ability to fire is an essential feature of an "assault weapon" as defined in section 12276.1, subdivision (a)(1). He says the word "semiautomatic" necessarily connotes an ability to fire.

In support of his interpretation, defendant cites as persuasive authority section 12126, subdivision (e) and *Silveira v. Lockyer* (9th Cir. 2002) 312 F.3d 1052, criticized on another point in *U.S. v. Vongxay* (9th Cir. 2010) 594 F.3d 1111, 1116. Section 12126, subdivision (e) contained a definition of an "unsafe handgun," and under the umbrella of unsafe handguns, a further definition of "semiautomatic pistol," for the purpose of part 4, title 2, chapter 1.3 of the Penal Code. Subdivision (e) defined a "semiautomatic pistol" as "a pistol, as defined in subdivision (a) of Section 12001, the operating mode of which uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of the trigger." (Former § 12126, subd. (e).)

*Silveira v. Lockyer, supra,* 312 F.3d 1052 describes semiautomatic weapons in this manner: "In contrast to automatic weapons, only one bullet is fired when the user of a semi-automatic weapon depresses the trigger, but another is automatically reloaded into the gun's chamber. 27 C.F.R. § 178.11 (defining semi-automatic weapons). Thus, by squeezing the trigger repeatedly and rapidly, the user can release many rounds of ammunition in a brief period of time—certainly many more than the user of a standard, manually-loaded weapon. Moreover, the semi-automatic weapons known as assault weapons contain large-capacity magazines, which require the user of the weapon to cease firing to reload relatively infrequently because the magazines contain so much ammunition." (*Silveira v. Lockyer, supra,* 312 F.3d at p. 1057, fn. 1.)

Defendant does not claim that either the definition provided in section 12126, subdivision (e), or the definition contained in *Silveira v. Lockyer, supra,* 312 F.3d 1052, applies to the AWCA, found in part 4, title 2, former chapter 2.3 of the Penal Code. However, he maintains that those definitions illustrate well the point that a semiautomatic weapon must be a weapon that has the ability to fire.

■ In construing a statute, we first look at its words, giving significance to each one. (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 741 [25 Cal.Rptr.3d 879].) We do not insert any words or elements the Legislature has not included. (*Id.* at p. 744.) Defendant insists that if we were to construe a box of parts as a semiautomatic weapon, then we essentially would eliminate the word "semiautomatic" from section 12276.1 and insert instead a clause defining a box of parts that could be assembled at some future time to constitute an already assembled and presently operational weapon. He maintains that the AWCA as written simply does not ban possession of the unassembled parts of a semiautomatic weapon.

■ Bearing this in mind, defendant urges us to apply the rule of lenity. "Under that rule, 'language in a penal statute that truly is susceptible of more than one reasonable construction in meaning or application ordinarily is construed in the manner that is more favorable to the defendant. [Citation.] Nonetheless, " 'the rule of lenity applies only· if the court can do no more than guess what the legislative body intended; there must be an egregious ambiguity and uncertainty to justify invoking the rule.' . . . 'The rule of statutory interpretation that ambiguous penal statutes are construed in favor of defendants is inapplicable unless two reasonable interpretations of the same provision stand in relative equipoise, i.e., that resolution of the statute's ambiguities in a convincing manner [is] impracticable.' " (*People v. Hagedorn, supra,* 127 Cal.App.4th at p. 742.) "Thus, 'it is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend.' " (*Id.* at p. 743.)

Taking these principles into consideration, however, we do not reach the same conclusion defendant does. Rather, we conclude that, given the intent of the AWCA as expressed in section 12275.2, subdivision (a), to protect the health, safety, and security of the citizens in the state from the danger of assault weapons, it would be absurd to construe the AWCA as authorizing the possession of an AK-47 kit such that sections 12276.1 and 12280 would bar conviction for attempted possession or manufacture of an assault weapon based upon possession of such a kit.

(b) *Non-AWCA statutes*

Defendant's citation to section 12001 does not convince us otherwise. Subdivision (a)(1) thereof provided: "As used in [title 2 of part 4 of the Penal Code], the terms 'pistol,' revolver,' and 'firearm capable of being concealed upon the person' shall apply to and include any device *designed to be used as a weapon*, from which is expelled a projectile by the force of any explosion, or other form of combustion, and that has a barrel less than 16 inches in length. . . ." (Former § 12001, subd. (a)(1), italics added.) Defendant says that because the Legislature did not include in the AWCA similar language banning the possession of weapons "designed to be used" as a firearm, it must not have intended to ban the possession of a box of parts "designed to be used" as an assault weapon.

True, courts have stated that " ' " '[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed.' " [Citation.]' [Citations.]" (*People v. Hagedorn, supra*, 127 Cal.App.4th at p. 742.) Here, the Legislature in section 12001, subdivision (a)(1), addressed the classification of a device from which a projectile is expelled "by the force of any explosion, or other form of combustion," provided the device was "designed to be used as a weapon." However, it was patently unnecessary for the Legislature to specify that an AK-47 could not be construed as an assault weapon unless it was designed to be used as a weapon. Defendant has not suggested that an AK-47 could have been designed to be used as something other than a weapon.

Defendant also cites section 12001, subdivision (c), which stated: "As used in Sections 12021, 12021.1, 12070, 12071, 12072, 12073, 12078, 12101, and 12801 of this code, and Sections 8100, 8101, and 8103 of the Welfare and Institutions Code, the term 'firearm' includes the frame or receiver of the weapon." (Former § 12001, subd. (c).) According to defendant, if the Legislature had intended for the possession of individual parts of a semiautomatic weapon to constitute the possession of an assault weapon, it would have said so, as it did in section 12001, subdivision (c). However, in this case, we are not addressing whether possession of only the frame or receiver should constitute possession of an entire assault weapon. We are addressing whether possession of all of the parts constitutes an attempt to possess or manufacture the entire weapon.

Moreover, section 12001, subdivision (c) did not define a frame or receiver of a weapon to be a firearm for all purposes. It stated that possession of a frame or receiver should constitute possession of a firearm in specified contexts, such as possession by a convicted felon (former § 12021) or a

person convicted of a violent crime (former § 12021.1). If possession of only a receiver constitutes the possession of a firearm by a convicted felon, why should possession of all of the parts of an AK-47 not constitute the possession of an assault weapon?

In his reply brief, defendant cites several other statutes, which specifically address the possession of the parts of certain weapons. Section 12020, subdivision (c)(1) defined a "short-barreled shotgun" to include "any combination of parts from which a [short-barreled shotgun] can be readily assembled if those parts are in the possession or under the control of the same person." (Former § 12020, subd. (c)(1)(E), current § 17180, subd. (e).) Similarly, section 12020, subdivision (c)(2) defined a "short-barreled rifle" to include "any combination of parts from which a [short-barreled rifle] may be readily assembled if those parts are in the possession or under the control of the same person." (Former § 12020, subd. (c)(2)(E), current § 17170, subd. (e).) Finally, the definition of a "machinegun," as contained in section 12200, included "any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." (Former § 12200.)

Defendant asserts that the Legislature's failure to enact any similar statutory provision with respect to assault weapons shows that it did not intend for the possession of the parts of an AK-47 to be a violation of the AWCA. However, defendant was not convicted of a violation of section 12280. Rather, he was convicted of attempt. Defendant has not convinced us that the Legislature intended for sections 12276.1 and 12280 to bless the possession of an AK-47 kit so as to preclude conviction for attempt. However, we invite the Legislature to amend the relevant statutes if it disagrees with this decision.

## B. *Attempt*

■ "In general, under California law, '[a]n attempt to commit a crime is itself a crime and [is] subject to punishment that bears some relation to the completed offense.' [Citation.] Section 664 provides in this regard that '[e]very person who attempts to commit *any* crime, but fails, or is prevented or intercepted in its perpetration' (italics added), is punishable as set forth in that provision . . . ." (*People v. Toledo* (2001) 26 Cal.4th 221, 229 [109 Cal.Rptr.2d 315, 26 P.3d 1051], fn. omitted.)

"Furthermore, as provided by section 21a, '[a]n attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' As past decisions explain: 'One of the purposes of the criminal law is to protect society from those who

intend to injure it. When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime.' [Citation.] When a defendant acts with the requisite specific intent, that is, with the intent to engage in the conduct and/or bring about the consequences proscribed by the attempted crime [citation], and performs an act that 'go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action' [citation], the defendant may be convicted of criminal attempt." (*People v. Toledo, supra*, 26 Cal.4th at pp. 229–230, fn. omitted.)

We turn to each of the attempt crimes of which defendant was convicted. First, we look at the attempted unlawful assault weapon activity conviction, arising out of section 12280, subdivision (a)(1). That statute applied to "[a]ny person who . . . manufactures or causes to be manufactured . . . any assault weapon . . . ." (Former § 12280, subd. (a)(1).) Here, defendant familiarized himself with the AK-Builder.com Web site and obtained all the parts necessary to build an AK-47. Those parts, according to Schuch's testimony, would assemble into a firearm that met the definition of an "assault weapon" as set forth in section 12276.1, subdivision (a)(1). Once in possession of the parts, defendant bent the flat receiver so that the weapon could be assembled. Thus, he went beyond mere preparation, and took direct action towards the construction of the weapon, inasmuch as he obtained the parts and took at least one step towards assembly. He was prevented from completing the construction of the weapon by the police, who confiscated the parts. The evidence is sufficient to support a conviction for attempted manufacture of an assault weapon.

Second, we look at the attempted possession of an assault weapon conviction, arising out of section 12280, subdivision (b), which made it a crime for "[a]ny person" to "possess[] any assault weapon." (Former § 12280, subd. (b).) As discussed above, defendant acquired all the parts of an AK-47 assault weapon and took the step of bending the flat receiver, which may be construed as a direct action towards possessing a fully functional weapon. Had the police not intervened, defendant would have completed the assembly and thereupon been in possession of an "assault weapon" within the meaning of section 12276.1, subdivision (a)(1). Consequently, the evidence is sufficient to support a conviction for attempted possession of an assault weapon.

Defendant disagrees. Remarkably, he contends "there is no evidence that [he] intended to build a rifle he knew or should have known . . . had the necessary characteristic of being an 'assault weapon' as defined in Section 12276.1." He cites *In re Jorge M.* (2000) 23 Cal.4th 866 [98 Cal.Rptr.2d 466,

4 P.3d 297], which provides that "the People must prove . . . that a defendant charged with possessing an unregistered assault weapon *knew or reasonably should have known* the characteristics of the weapon bringing it within the registration requirements of the AWCA." (*Id.* at pp. 869–870.) He maintains that the only relevant evidence in the record demonstrates that defendant neither knew nor reasonably should have known the characteristics of the weapon bringing it within the registration requirements of the AWCA. We could not disagree more.

Section 12276.1, subdivision (a)(1), as we recall, provided that the term "assault weapon" included "[a] semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following: [¶] (A) A pistol grip that protrudes conspicuously beneath the action of the weapon. [¶] (B) A thumbhole stock. [¶] (C) A folding or telescoping stock. [¶] (D) A grenade launcher or flare launcher. [¶] (E) A flash suppressor. [¶] (F) A forward pistol grip." (Former § 12276.1, subd. (a)(1).)

At trial, Schuch was asked to look at defendant's box of AK-47 parts. He opined that all the parts were present to build an AK-47-type weapon. More specifically, he said they would create a semiautomatic, centerfire rifle, with "the capacity to accept a detachable magazine." He further stated that the rifle would have "a pistol grip protruding conspicuously beneath the action of the weapon," a folding stock, and a "forward pistol grip." In other words, Schuch's testimony clearly shows that the parts would build an "assault weapon" within the meaning of section 12276.1, subdivision (a)(1).

In an effort to avoid this conclusion, defendant cites a transcript of a March 18, 2010 telephone conversation he had with Chapman and a portion of the trial testimony of Michael Penhall. Defendant asserts that the evidence in the cited pages shows that the AK-47 parts he possessed could have been built into a variety of legal configurations. We disagree.

In the telephone conversation, Chapman asked defendant where he got the box of AK-47 parts. Defendant said that he bought the kit over the Internet from Henderson Defense and that he bought the receiver from AK-Builder.com. Defendant remarked that it was "amazing" what you could get over the Internet and that YouTube made it "look so easy." This evidence does not support defendant's assertion that he neither knew nor reasonably should have known of the characteristics of the weapon that brought it within the registration requirements of the AWCA. Rather, this evidence shows that defendant knew he had purchased the parts for an AK series weapon.

Penhall was a gun store owner called as a defense witness. Penhall acknowledged that he had had the chance to look at the parts taken from

defendant. When asked what they appeared to be, Penhall replied, "They appear to be AK-style firearms." Penhall was also asked if there were different ways that the collection of parts could be configured, and he responded: "I mean, there's really only one way to build it, you know, to make it fire a round." Penhall's testimony, consistent with that of Schuch, shows that defendant had purchased the parts to build an AK-style weapon and supports the assertion that defendant reasonably should have known that he had done so. It does not support a contrary position.

Defendant relies on a span of five pages of Penhall's testimony wherein Penhall was asked whether the weapon could be configured differently, "not necessarily just based on the parts that are present, but" if other parts were purchased. Penhall replied, for example, "If I purchased a magazine lock, I could build the same rifle just with a fixed magazine." However, just because Penhall was asked a series of questions about how the weapon could be assembled if other parts were purchased, and added to or substituted for the parts on hand, that does not mean defendant did not know, or had no reason to know, of the characteristics of the weapon parts he did purchase that brought them within the purview of the AWCA. The parts he chose to buy would build an "assault weapon" within the meaning of section 12276.1, subdivision (a)(1).

"In cases where the information reasonably available to a gun possessor is too scant to prove he or she should have known the firearm had the characteristics making it a defined assault weapon, the possessor will not be subject to section 12280(b) . . . ." (*In re Jorge M., supra*, 23 Cal.4th at p. 886.) The information available to defendant here was not scant. He obtained information on the AK-Builder.com Web site. Furthermore, he admitted to Chapman that he knew it was wrong to make and possess his own AK-47.

It is true, "[a] state court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason. [Citation.]" (*People v. Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897].) In determining the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*Ibid.*) We conclude the evidence was sufficient in this case.

In a footnote regarding attempt, defendant states the jury should have been instructed that the possession of AK-47 parts cannot be used to infer intent to possess or manufacture an assault weapon. He does not support his argument with citation to legal authority and he does not provide a separate topic

heading for jury instruction error. His argument is deemed waived. (*Akins v. State of California* (1998) 61 Cal.App.4th 1, 17, fn. 9 [71 Cal.Rptr.2d 314].)

### C. *Statutes Unconstitutional as Applied*

Next, defendant contends that his due process rights were violated because the statutes in question were unconstitutionally vague as applied. He argues that neither the AWCA nor case law fairly disclosed to him that it was unlawful to possess or modify parts that can be assembled into an assault weapon.

■ "[A]n as applied challenge assumes that the statute or ordinance violated is valid and asserts that the manner of enforcement against a particular individual or individuals or the circumstances in which the statute or ordinance is applied is unconstitutional." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1089 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) "It contemplates analysis of the facts of a particular case . . . to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right. [Citations.] When a criminal defendant claims that a facially valid statute or ordinance has been applied in a constitutionally impermissible manner to the defendant, the court evaluates the propriety of the application on a case-by-case basis to determine whether to relieve the defendant of the sanction. [Citation.]" (*Id.* at p. 1084.)

■ " 'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without due process of law," as assured by both the federal Constitution [citation] and the California Constitution [citation]. Under both Constitutions, due process of law in this context requires two elements: a criminal statute must " 'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt.' " [Citations.]' " (*People v. Hagedorn, supra*, 127 Cal.App.4th at p. 745.)

" 'The starting point of our analysis is "the strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.' " [Citation.]' [Citation.]" (*People v. Hagedorn, supra*, 127 Cal.App.4th at p. 745.)

■ " 'There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of "a statute which

either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.["] [Citations.] Second, . . . the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. [Citations.] Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute [citations], due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope [citations]. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.' [Citation.]" (*People v. Hagedorn, supra*, 127 Cal.App.4th at pp. 745–746.)

" 'It is impossible, given the complexities of our language and the variability of human conduct, to achieve perfect clarity in criminal statutes. Reasonable specificity exists if the statutory language "conveys sufficiently definite warning as to the proscribed conduct when measured by common understandings and practices." [Citations.]' [Citation.]" (*People v. Hagedorn, supra*, 127 Cal.App.4th at p. 746.)

Here, defendant says that neither the AWCA nor case law fairly disclosed to him that it was unlawful to possess the unassembled parts of an AK-47. But defendant was not convicted of either manufacturing or possessing an assault weapon, in violation of section 12280. He was only convicted of attempt.

Common understandings and practices were that an AK-47 kit could be assembled into an assault weapon. Indeed, information on the topic was readily available on the Internet (both AK-Builder.com and YouTube). Looking at the matter on a case-by-case basis, we see here that defendant, who previously had assembled a high-powered rifle, purchased what he knew to be AK-47 parts, with the intent of assembling them, and took direct action to assemble them, having bent the receiver into shape to further the process and enable completion. Although defendant did not finish putting together the parts, which would have assembled into an "assault weapon" as defined in section 12276.1, subdivision (a)(1), he had begun the process of manufacturing the assault weapon when the police impeded his efforts. By definition, he had attempted manufacture. Upon completion, he would have been in unlawful possession of a functional assault weapon. Thus, he had attempted possession as well.

### D. Request for Judicial Notice

On the date defendant filed his appellant's reply brief, he also filed a request for judicial notice. The request was denied for failure to show relevance to the appeal. Shortly thereafter, defendant filed another request for judicial notice, accompanied by a memorandum of points and authorities. He requests that this court take notice of copies of (1) Senate Bill No. 23 (1999–2000 Reg. Sess.), approved by the Governor and filed with the Secretary of State on July 19, 1999, (2) the California Attorney General's Assault Weapons Identification Guide (3d ed. Nov. 2001), (3) an Attorney General's letter ruling dated December 17, 2003, (4) an undated printout of the Attorney General's Web page addressing frequently asked questions about assault weapon registration, which defendant represents was printed on September 11, 2012, and (5) Senate Bill No. 249 (2011–2012 Reg. Sess.), as introduced on February 10, 2011, and amended by the Assembly on May 22, 2012.

At the outset, we must state that we disapprove of the timing of defendant's request. (Cf. *Akins v. State of California, supra,* 61 Cal.App.4th at p. 17, fn. 9; *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 976 [6 Cal.Rptr.2d 193].) However, inasmuch as the People have filed no objection, we will grant the request. (Evid. Code, §§ 452, 459.) At the same time, we chastise defendant for providing five exhibits, totaling well in excess of 100 pages, and then making broad references to the various exhibits in his reply brief without providing any page references. Having failed to provide any page references, his arguments based on these exhibits are deemed waived. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 [115 Cal.Rptr.2d 705].)

### E. Evidentiary Rulings

The court denied defendant's pretrial motion for the exclusion of certain evidence and overruled some of his evidentiary objections at trial. Defendant renews his arguments on appeal. He challenges the admission of evidence concerning the weaponry found in his possession, the comparison of different types of ammunition, the convertibility of the .50-caliber DTC rifle, and the comparison of that rifle to a semiautomatic weapon. We turn now to the evidence in question.

#### (1) Evidence

##### (a) Chapman's testimony about items found on premises

Defendant first complains about Chapman's testimony concerning the ammunition found at defendant's business premises. Chapman testified that

defendant led him to a box of .50-caliber DTC ammunition, that went with his .50-caliber DTC rifle, and also showed him the .50-caliber Beowulf ammunition. Chapman further said that defendant had told him the Beowulf ammunition went to a rifle he had rented for a pig hunt, and was left over from that hunt.

(b)   *Chapman's testimony comparing ammunition*

A tape recording of the March 18, 2010 telephone conversation between defendant and Chapman was played for the jury. A transcript of the recording was entered into evidence as an exhibit. That transcript reflects, in pertinent part, the following exchange:

Chapman: "Tell me again . . . , that round is not a .50 BMG?"

Defendant: "No. It's a DTC."

Chapman: ".50 DTC?"

Defendant: "Yeah. It's not quite a .50. That's why they make it California legal. Cause California doesn't allow .50-caliber BMG. So they go DTC. What it is, it's shorter. It's a little smaller."

Chapman: "It uses the same bullet though?"

Defendant: "No."

Chapman: "Is it a smaller case?"

Defendant: "Smaller. Like if you were to put the DTC in the BMG it wouldn't fire. Vice versa."

Chapman: "Cause the BMG would be too big to put in the chamber?"

Defendant: "Right. Right."

Chapman: "Ah, could you use the same bullet just not the same case. Make it smaller? Do you know?"

Defendant: "What do you mean? Like the bullet?"

Chapman: "The bullet tip."

Defendant: "Oh. I don't know."

Chapman: "It's all .50 [unintelligible]. Why do you have the [ammunition] for the .50 Beowulf?"

Defendant: "Oh. That's for the hogs."

Chapman: "Yeah, um but you can't fire that out of your rifle?"

Defendant: "Oh, hell no. It won't even take it."

Although defendant does not appear to challenge the admission of the transcript of the recording into evidence, he claims the court erred in admitting certain testimony that was presented *after* the recording was played for the jury. The prosecutor then asked Chapman for clarification about the portion of the conversation about the DTC ammunition versus the BMG ammunition. Chapman responded: "Well, I looked online. And my understanding is that the .50 BMG, which is a military round[,] is that the .50—well, it's not legal in California. And the law is very specific as to the dimensions of the .50 BMG round. So they came up with this .50 DTC. And my understanding is that it uses the same bullet, the same type of cartridge, which would be like the brass, but they neck it down ever so slightly and taper it so the dimensions aren't exactly the same. I put a .50 BMG round up next to it. And this one is just very slightly shorter, so it doesn't fit the criteria of a .50 BMG." The prosecutor then asked Chapman whether it was correct to say that when he and defendant were discussing the "BMG" or the "DTC" on the tape recording, they were talking about two different kinds of ammunition. Chapman responded, "Yes."

Defendant also appears to challenge the admission into evidence of People's exhibit No. 14. That exhibit was a photograph of three types of ammunition—the .50-caliber DTC ammunition, the .50-caliber Beowulf ammunition, and ammunition from a .40-caliber Smith & Wesson handgun, which Chapman said he carried when on duty.

### (c)  *Schuch's demonstration testimony*

Defendant also challenges the admission of portions of Schuch's testimony. Schuch was shown the .50-caliber Beowulf ammunition and the .50-caliber DTC ammunition. The prosecutor asked Schuch about one of the bullets and whether it could be used with an AK-47. Schuch replied that it could not. He also stated that one of the bullets had been "developed as a light anti-armor weapon" and that the other could be used for hunting. In response to questioning, Schuch also explained that one of the two bullets could be used with the .50-caliber DTC rifle, but that the other could not, at least as the rifle was then set up. He further explained that the .50-caliber DTC rifle had

interchangeable parts, such that the entire "upper assembly" could be sepa-rated by the removal of only two pins. The upper assembly could be replaced with a range of different upper assemblies. Which of the .50-caliber bullets fit the rifle simply depended on which upper assembly was being used.

When asked, Schuch testified that it appeared defendant had all the parts necessary to build an AK-47-type semiautomatic rifle. The prosecutor then asked Schuch what a semiautomatic rifle was. Schuch then made reference to the .50-caliber DTC rifle in order to explain the concept. He explained how he needed to pull the bolt back, then it would "extract and eject a round" and then it would "feed a new one, but [he had] to do it himself." In contrast, he explained that a semiautomatic weapon would do all the work for him instantaneously. He said, "Instead of me manipulating the bolt here, the gun [would do] the work for me."

(2) *Analysis*

Defendant maintains that the .50-caliber DTC rifle was neither an assault weapon nor semiautomatic. He argues that the rifle and ammunition in his possession were lacking in probative value inasmuch as they were not relevant to show he was capable of building an AK-47. Similarly, defendant contends that the evidentiary value of these items was speculative at best. He also complains that it was improper to permit Chapman to compare the .50-caliber DTC ammunition with .50-caliber BMG ammunition, and to admit People's exhibit No. 14, which pictured three different types of ammunition. He reiterates that the comparison of the different types of ammunition has no probative value with respect to the possession or manu-facture of an AK-47, especially where the ammunition in question does not fit the firearm at issue. In addition, defendant maintains that Schuch's testimony concerning the conversion of a .50-caliber DTC rifle into a .50-caliber Beowulf rifle and explaining the meaning of "semiautomatic" by comparison to a .50-caliber DTC rifle was irrelevant and prejudicial.

Evidence Code "[s]ection 352 provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' We review a challenge to a trial court's choice to admit or exclude evidence under section 352 for abuse of discretion. [Cita-tion.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 281–282 [109 Cal.Rptr.2d 870].) Evidence Code section 352 rulings " 'will not be over-turned on appeal in the absence of a clear abuse of . . . discretion, upon a showing that the trial court's decision was palpably arbitrary, capricious, or patently absurd, and resulted in injury sufficiently grave as to amount to a

miscarriage of justice.' [Citation.]" (*People v. Lamb* (2006) 136 Cal.App.4th 575, 582 [40 Cal.Rptr.3d 609].)

■ Citing cases pertaining to the admission of evidence of uncharged crimes, the People assert that the challenged evidence was admissible to show defendant's intent to build and possess an AK-47. " 'Evidence of uncharged crimes is admissible to prove . . . intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of . . . intent. [Citation.]' [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 [117 Cal.Rptr.3d 658, 242 P.3d 105].) " 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' [Citation.]" (*Ibid.*) "If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, . . . the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)' [Citation.]" (*People v. Foster, supra*, 50 Cal.4th at p. 1328.)

Here, the .50-caliber DTC rifle was of sufficient similarity to an AK-47 that the possession of the .50-caliber weapon and ammunition supported the inference that defendant harbored the intent, or had a goal, to possess a fully assembled AK-47. Evidence defendant possessed both a .50-caliber rifle he had assembled himself, plus two types of .50-caliber ammunition, had a tendency in reason to show that he was familiar with high-powered firearms and their assembly. Put another way, it had a tendency in reason to show that he was neither ignorant of firearms nor unwittingly in possession of an AK-47 kit he lacked the knowledge or ability to assemble. Consequently, the evidence was not lacking in probative value.

The comparison of various types of ammunition was relevant to show the nature of the ammunition in defendant's possession and to show that he was familiar with high-powered weapons. Testimony regarding different types of ammunition in defendant's possession was also probative inasmuch as Schuch testified that the .50-caliber DTC rifle could have been altered to accept different types of ammunition. In any event, we note that defendant fails to recognize some of the testimony comparing types of ammunition was favorable to him—Schuch's testimony that one of the types of ammunition was suitable for hunting.

Having concluded both that the evidence has probative value and supports an inference that defendant harbored an intent to build and possess an AK-47,

the question then is whether the probative value of the evidence regarding the possession of those items, the comparison of the various types of bullets, and the demonstrations with the .50-caliber DTC rifle, was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. Defendant argues that the .50-caliber DTC rifle is a more menacing firearm than an AK-47 and that evidence of that rifle and the .50-caliber ammunition was inflammatory and prejudicial. He asserts that the evidence may have suggested he was predisposed to commit violent acts and may have lead to an assumption of guilt based on the possession of legal firearms.

" 'Prejudice' as contemplated by section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.]" (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008 [62 Cal.Rptr.2d 164].) "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Id.* at p. 1009.)

Given that defendant admits to having begun assembling an AK-47 from a kit, and having gone on the AK-Builder.com Web site for guidance, the evidence against him was strong and it is unlikely that evidence regarding defendant's possession of other weaponry would be unduly prejudicial. In short, we cannot say it was " 'palpably arbitrary, capricious, or patently absurd' " to have permitted the testimony to which defendant objects. (*People v. Lamb, supra*, 136 Cal.App.4th at p. 582.)

Even were we to agree that the court erred in admitting some of the evidence, we would conclude that the error was harmless. (*People v. Breverman* (1998) 19 Cal.4th 142, 172 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) The California Constitution "provides that '[n]o judgment shall be set aside' for various kinds of error in the conduct of the trial, including 'misdirection of the jury' and 'improper admission or rejection of evidence,' unless 'an examination of the *entire cause, including the evidence*' indicates that the error resulted in a 'miscarriage of justice.' (Cal. Const., art. VI, § 13, italics added.)" (*People v. Breverman, supra*, 19 Cal.4th at p. 173.) Under *People v.*

*Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman, supra,* 19 Cal.4th at p. 177.) That is to say, "[a] conviction of the charged offense may be reversed in consequence of . . . error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson, supra,* 46 Cal.2d 818, 836)." (*People v. Breverman, supra,* 19 Cal.4th at p. 178, fn. omitted.) Again, inasmuch as defendant acknowledges having begun assembling an AK-47, and having gone on the AK-Builder.com Web site for guidance, the evidence against him was strong. Evidence supporting a different outcome was all but nonexistent. In short, we cannot conclude that it is reasonably probable that defendant would have obtained a more favorable outcome had the challenged evidence been excluded.

In addition to arguing that the admission of evidence warrants reversal under the *Watson* standard, defendant contends that the errors were so grave as to violate due process. "But the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.* [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765].) Defendant has not shown this to be the case.

Finally, defendant asserts that testimony about the illegality of the items of evidence, and their military history and use, was incorrect. However, if either Chapman or Schuch provided inaccurate information, in remarking upon the illegality of the weapons or ammunition or their military history or use, this does not go to the issue of admissibility. Defendant had an opportunity to cross-examine these witnesses to bring out any errors and to provide testimony of his own witnesses to contradict the statements of Chapman and Schuch.

F. *Probation Conditions*

In the final sentence of his opening brief, defendant says that, "for the reasons stated in Argument VI, the probation condition that [he] 'maintain residence and associates as approved by your probation officer' must be stricken." However, there is no "Argument VI" in the opening brief and, indeed, we have found no portion of the brief at all that addresses the probation condition. Consequently, any argument concerning the probation condition is waived for failure to provide argument or to cite to the record or

to legal authority. (*Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 634, 648 [113 Cal.Rptr.3d 20].)

## III

## DISPOSITION

The judgment is affirmed.

Bedsworth, Acting P. J., and Fybel, J., concurred.