Filed 2/23/15  P. v. Morris CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D064450 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD214650) |
| TAMOYIA DUSHAWN MORRIS, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Tamoyia Morris appeals from a judgment convicting him of two counts of murder, five counts of false imprisonment, and other offenses, with true findings on gang enhancements and various other enhancements and special circumstance allegations. The charges arose from an incident in which members of the Lincoln Park gang entered a home associated with another Lincoln Park gang member who was in trouble with the gang for not complying with the gang's dictate that he share the proceeds from his drug dealing with the gang. Defendant argues there is insufficient evidence to support that he was one of the perpetrators of the offenses. In support, he challenges two key items of the prosecution's case, contending (1) the trial court erroneously admitted a hearsay statement identifying him as a perpetrator under the declaration against penal interest exception, and (2) his DNA found at the scene had no evidentiary weight because the experts could not definitively determine that it was deposited at the time of the offenses as opposed to an earlier date. We reject these contentions and find sufficient evidence to support the jury's verdict.

Further, defendant contends (1) the trial court erred in admitting a different item of DNA evidence that he claims was irrelevant and prejudicial; (2) the court erred in failing to sua sponte clarify the meaning of "in association with" a gang for the gang enhancements; (3) there was insufficient evidence to support the gang enhancements; and (4) an expert improperly assumed defendant was a perpetrator when providing opinion testimony. We find no reversible error.

Finally, defendant raises legal challenges to the multiple murder, prior murder, and felony murder special circumstances, which we find unpersuasive.

2

FACTUAL AND PROCEDURAL BACKGROUND

The criminal events in this case occurred in November 2005 when several members of the Lincoln Park gang entered a residence (located on Velma Terrace) to search for cash that they believed had been placed there by Lincoln Park gang member, Tyree "ZZ" Jabbar (ZZ).[1] During the burglary and attempted robbery at this residence, the gang members tied up five people who were at the residence and ultimately shot and killed two of them. One of the victims (Meico McGhee) was ZZ's older brother. ZZ was a younger Lincoln Park gang member who had incurred the wrath of older Lincoln Park gang members because he was not distributing money he earned from drug sales back into the gang.

As we shall detail below, key components of the prosecution's evidence included DNA found at the scene showing defendant's DNA and victim McGhee's DNA in the same bloodstain, and a police interview with a Lincoln Park gang member (Marquis Veal) who was arrested in 2008 for a parole violation and agreed to speak about the gang's activities. Veal claimed gang member Terrill Bell had identified himself and three other older gang members (Michael Mason, Elliott Perry, and defendant) as perpetrators of the Velma Terrace crimes. Additionally, the prosecution presented evidence derived from recorded phone conversations between defendant and defendant's cousin (Dana Purvis), who was also a Lincoln Park gang member. These conversations, which were recorded in 2004 and early 2005 via wiretaps associated with crimes occurring prior to

_____

[1]    To the extent people involved in this case share the same last names, we refer to them by their first names.

and unrelated to the Velma Terrace crimes, provided information about conflicts occurring between different factions of the Lincoln Park gang and shed light on the motive for the subsequent Velma Terrace offenses. From the wiretapped conversations and interview with Veal, the authorities learned that in the months preceding the Velma Terrace offenses, there had been violent altercations arising from a conflict between ZZ and Bell concerning ZZ's refusal to provide drugs to Bell, and a dispute had developed between defendant and ZZ because ZZ had elected to work with a competing Lincoln Park faction led by Carl Rouse.

The key disputed issue at trial was whether defendant was present at the scene during the Velma Terrace offenses. The defense theory was that Veal's identification of defendant as one of the perpetrators was based on rumor rather than from information provided by Bell, and it was impossible to know if defendant's DNA was deposited at the scene at the time of the crimes or on an earlier occasion when he visited ZZ at the residence.

*Conflicts Within the Lincoln Park Gang Concerning the Murder Victim's Brother ZZ*

Through the wiretap surveillance and the information later provided by Veal, the authorities learned that in 2004 and 2005 the Lincoln Park gang (which had about 445 documented members) was going through a period of sharp divisions among its members. The gang was fractured among different crews who were separately engaging in robbery and drug trafficking. Also, younger gang members who were making money on drug sales were not giving money to the older members who had "put in the work" and been incarcerated. Older Lincoln Park gang members were not seeing the respect

4

and support from the younger drug-dealer gang members, and the older members were trying to explain to the younger ones how things operate within the gang and to get them to pay "their dues." According to a prosecution gang expert, the whole idea of a street gang is to "stay together" and if "one succeeds, they all succeed," and gang members who engage in drug dealing make money to provide the "fuel" that runs the gang.

Because ZZ was not giving money from his drug dealing back to the gang, other Lincoln Park gang members were confronting him, including by robbing and threatening him. Bell was an older member of a Lincoln Park crew that was trying to "tax" ZZ and was not satisfied with the amount of money provided by ZZ. During an incident in the fall of 2004, Bell confronted ZZ at a convenience store parking lot and told ZZ that he had to supply him with drugs or he would be disciplined. ZZ never provided the drugs. Several days later, Bell followed ZZ while they were in their vehicles, and during this incident ZZ shot at Bell and struck his vehicle. Shortly thereafter, in September 2004, Bell shot and killed ZZ's father while the father was standing outside the family residence.

After the shooting of ZZ's father, ZZ moved out of the family residence to an unknown location. The wiretaps revealed that gang members believed ZZ was holding a large amount of cash somewhere, and gang members wanted to find it. When ZZ "surfaced again" in January 2005, he was tied up and robbed a second time by a Lincoln Park gang crew led by Rouse. During this robbery, ZZ provided the gang members with the home address of defendant's younger cousin (Purvis) as a possible place to find the money.

5

In intercepted phone calls between defendant and Purvis, they talked about the January 2005 robbery of ZZ, and Purvis told defendant that whatever defendant was " 'thinking of doing to [ZZ] has already been done.' " Defendant told Purvis that he would take ZZ "under his wing" so the robberies from the other gang members would stop. Because ZZ was concerned he would be targeted again by the other gang members, defendant allowed ZZ to stay at another location unknown to the other gang members. The gang expert explained that when an older gang member provides this type of protection to a younger gang member it is not done out of friendship or concern but rather for purposes of control, and the younger member is expected to compensate the older member.

The intercepted phone calls revealed defendant's attempt to establish this protective relationship with ZZ ultimately was not successful because ZZ eventually started working with Rouse's faction of the Lincoln Park gang. Defendant and Rouse had a "history" and were antagonistic towards each other; they were competing for ZZ's cooperation with their respective crews; and defendant was angry that ZZ had decided to work with Rouse. Defendant told Purvis he saw ZZ get into a car with Rouse and ZZ was not listening to him and was not "following the plan." In another call, defendant instructed Purvis to call ZZ and tell him not to shoot at defendant like he shot at Bell when defendant came to retrieve some keys from ZZ.

Based on the wiretaps and physical surveillance of Rouse's robbery crew and of ZZ, the authorities arrested ZZ in March 2005 at the Velma Terrace residence where ZZ was believed to be staying at the time. Rouse was also arrested.

6

*The Velma Terrace Murders*

The three surviving victims of the Velma Terrace crimes were ZZ's sister (Hana Jabbar), Preston Adams and his wife Stacey Adams. The two murder victims were McGhee (ZZ and Hana's brother) and McGhee's girlfriend (Sacha Newbern). All of the victims except McGhee were living at the residence, and McGhee spent the majority of the day there and sometimes spent the night. ZZ was incarcerated at the time of the offenses.

The intruders arrived at the residence the morning of November 25, 2005, and did not leave until about 12 hours later. When the intruders first arrived at the residence, only Stacey and Newbern were at home, and during the course of the day Preston, McGhee, and Hana arrived. The victims were restrained while the intruders ransacked the home trying to find the money they thought was at the residence. McGhee was involved in a lengthy fight with the intruders in the hallway and, along with Newbern, was ultimately placed in a bathtub and shot. At trial, Stacey, Preston, and Hana testified about what occurred.

Sometime before 9:00 a.m., Stacey heard a noise, and when she opened her bedroom door, a masked man was standing there with a gun. He was yelling at her and asking where the $500,000 was, and she told him she did not know what he was talking about. The man told her to get down; she complied and the man "hogtied" her on her bedroom floor. A second man came in her bedroom and asked about the money and where Hana was; Stacey told him Hana was at work. The men blindfolded Stacey with a bandana.

7

Stacey could hear the intruders "rifling though stuff" throughout the house and going in and out of the house looking for the money. The men were communicating with each other through walkie-talkie type devices. At about noon or 1:00 p.m., Preston arrived and was confronted by a masked man pointing a gun at him and telling him to get down. Preston complied, and then another man blindfolded him and walked him at gunpoint to his bedroom, where he was tied up along with Stacey. The men were asking Preston if he knew anything about any money, and Preston told them that he had just moved in and did not know anything about it. At some point the men also brought Newbern into the bedroom with Stacey and Preston.

McGhee arrived home around 2:00 p.m., and when he did not comply with the intruders' orders to get down, they attacked him. There was a lengthy fight in the hallway, and Stacey and Preston heard people banging up against the walls and the sound of breaking glass from a picture frame. The men were saying " 'keep hitting him,' " yelling at him to give them the gun and to stop fighting, and asking him where the money was and about his brother. Eventually, Stacey and Preston could hear McGhee moaning and wheezing and no longer fighting, and they heard a man say to put him in the bathtub. Preston heard the men say " 'This fool, he just wouldn't listen. I don't know why he went for the gun.' "

After the fight with McGhee, Stacey and Preston could hear the men running the vacuum and using spray bottles to clean the hallway next to the bathroom and the living room.

When Hana arrived home around 4:35 p.m., a masked man held a gun to her head and told her to get down on the living room floor, and another man tied her up and blindfolded her.  The men addressed her by name; said they had heard a lot about her and knew " 'what's up' "; demanded the money that ZZ had hidden at the house; and told her if she did not give them the money they would kill her brother.  She knew there was no money at the house, but to try to save her brother she told the men it might be in the backyard.  The men took her to the back door to give directions about where to dig, and the men dug in the yard for about 15 or 20 minutes.  The men brought her back to the living room and continued to ask her where the money was.  Hana told them it was in a safe in her bedroom, and the men escorted her there and took off her blindfold so she could show them the safe.  The men thought she was "bull jiving" them about money in the safe but decided to take the safe with them.  They then hit her over the head with a gun and placed her in a closet in Newbern's bedroom.

Shortly before the shootings, the men moved Stacey and Preston to Hana's bedroom and retied them.  Newbern was lying on the hallway floor screaming.  The men turned on all the televisions in the house at full volume, and put Newbern in the bathtub with McGhee.  Stacey heard two of the men arguing; they were calling each other "blood" (a word associated with the Lincoln Park gang) and one of them was saying he was not going to do this alone and the other man had to "get some dirt on his hands too"

9

and "put in work."[2]  Preston and Stacey heard gunshots and smelled gasoline.  During the shooting, Preston heard a gunshot; heard one of the men say, " 'You shoot too . . . you've got to put in work also' "; and then heard another gunshot.  Hana (who was still in the closet) heard her brother begging for his life; heard the men tell him "[g]et ready to go with your father"; and then heard the gunshots.

After the shooting, the smoke alarms went off in the house, and the surviving victims could hear the men go out the front door.  The surviving victims were able to untie themselves, and they fled the residence, ran to their neighbors, and summoned the authorities.  Victims McGhee and Newbern, who had been shot in the head, died from their gunshot wounds.  They also suffered blunt force injuries and chemical burn injuries consistent with the use of gasoline.

The surviving victims thought there were three to six intruders involved in the incident.  Regarding the identity of the intruders, Hana identified one of them as Mason, and testified defendant was not one of the three men she was able to see at the residence.  Apart from Hana's identification, the surviving victims provided only general descriptions of the intruders' appearances.

---

[2]    At other points Stacey, Preston, and Hana heard the intruders call each other names associated with a rival Crips gang, but these witnesses felt this was an attempt to fool them about which gang the intruders were from.

10

DNA testing of evidence taken from the crime scene showed blood belonging to the murder victims; a mixture of victim McGhee's and defendant's DNA in a bloodstain on the bathroom door; and Mason's DNA on a cigarette butt in the bathroom toilet.

The mixture of McGhee's and defendant's DNA was located on a transfer bloodstain on the door of the bathroom where the victims had been killed. The parties stipulated that McGhee was a major contributor and defendant was a minor contributor to the DNA found in this blood stain. The bathroom door swung inwards from the hallway into the bathroom, and the stain was on the outside of the door as it faced the hallway and was located in the middle area of the door. A criminalist who examined the stain at the scene testified that it appeared there was a transfer of blood to the door followed by some movement which created a "swipe" or "wipe" transfer stain.[3]

To assist with the jury's determination of the significance of the DNA evidence, two DNA experts, Ian Fitch and Shawn Montpetit, testified on behalf of the prosecution to explain how DNA can be deposited, detected, and examined for degradation. They testified that DNA is most easily detected when a person leaves behind biological "source" material like blood, semen, saliva, or nasal secretions, and DNA transfers most readily in a moist environment. With the recent development of more sensitive testing,

---

[3]     The criminalist explained that a transfer stain occurs when a bloodstained object comes into contact with an unstained surface and leaves some evidence of that contact behind. A "swipe" transfer stain would have occurred on the door if a moving bloody object contacted the wall, and a "wipe" transfer stain would have occurred if there was blood on the wall and an object moved through it. He testified the bathroom door stain could have been from a swipe or a wipe, although a swipe appeared more likely.

DNA can also sometimes be detected when a person touches an object; for example, if a person repeatedly touches an object over time thereby depositing skin cells, and/or if the person has moisture on his or her hand from sources such as sweat, nasal secretions, or eyes when touching the object. DNA can remain on an object for several months, and the more someone handles an object, the more likely DNA will be deposited there; for example, residents of a home would likely leave DNA deposits throughout the home. However, touch DNA provides a much lower level DNA than DNA from bodily fluids such as blood or semen. Further, DNA degrades over time, and the rate of degradation can be influenced by weather and the use of cleaning products. Degraded DNA has a very characteristic look to it, and an examination of the DNA profile created from the testing can indicate whether degradation has taken place. Although it is not possible to determine when a DNA sample was deposited, the older the sample is, the more likely some kind of degradation would be observed.

The prosecution experts testified that the bathroom door bloodstain showed a DNA mixture from at least three or four people, including McGhee and defendant. McGhee's DNA was the major contributor and a very strong sample; defendant's DNA was a significant contributor; and the DNA from the remaining person or persons was at a level too low to allow a determination of its source. Because the DNA sample from the bathroom door contained blood and because McGhee was bleeding, it was reasonable to assume that McGhee's DNA was from the blood. Defendant's DNA could have come from either his blood or his skin cells.

12

Fitch testified he did not see any significant degradation in McGhee's and defendant's DNA samples from the bathroom door, and opined their DNA was "somewhat fresh" and consistent with having been "deposited simultaneously." He explained that if their DNA had been deposited at different times, he would have expected differences in degradation between the two DNA samples, with the older sample showing degradation and the newer sample not showing it, whereas the DNA in the blood stain showed no major degradation at all. Also, the DNA in the blood stain would have been at a much lower level if it was touch DNA.

Similarly, Montpetit testified that although there was a "slight differential degradation" between McGhee's DNA and the DNA of the other contributors in the bloodstain, there was no "significant degradation" in the samples and there was no significant difference in degradation between McGhee's DNA and defendant's DNA. Montpetit opined that McGhee's and defendant's DNA were deposited "in close proximity in time to each other," explaining that if the samples had been deposited at significantly different times he would have expected to see more of a difference in degradation between them.

Both Fitch and Montpetit acknowledged that although their evaluations of McGhee's and defendant's DNA samples were consistent with the samples having been deposited at the same time rather than at different times, they could not rule out that McGhee's and defendant's DNA were deposited at different times, and it was not possible to determine with any degree of scientific certainty when the samples were deposited. The experts recognized that the blood on the door could have been "swabbed over the

13

DNA samples" from the other DNA contributors, and it was possible that defendant's DNA had been on the door for several months or weeks or that it was deposited the same day as the crimes.

Montpetit also tested a DNA "control" sample taken from a spot on the bathroom door a few inches from the bloodstain on the door. His results showed this sample was highly degraded; it was from ZZ (who had not been in the house for over eight months); and it contained substantially more DNA than the DNA from the bloodstain. Based on the differences in degradation, he opined that ZZ's DNA had been on the door much longer than defendant's and McGhee's DNA.

Prior to the shootings, Hana had been living at the Velma Terrace residence for about four months and Stacey and Preston had been there almost two months. They did not know defendant and to their knowledge he had not been at the house while they lived there. Hana testified her brother ZZ (who was friends with defendant) had stayed at the house for about two weeks in February 2005.

*Post-murder Events, Including Bell's Identification of Defendant as a Perpetrator*

Defendant was identified as a suspect in the Velma Terrace murders about two years after their occurrence, when, in February 2008, Lincoln Park gang member Veal was arrested for a probation violation. Hoping to be released to attend his grandmother's funeral, Veal agreed to speak with the authorities about the gang's activities. In a video recorded interview (which was played for the jury), Veal told Detective Scott Barnes that

14

he acquired information about the Velma Terrace incident from Bell.[4]  Veal explained that the Velma Terrace house was known as "another Jabbar house" (apparently referring to ZZ), and the gang members were looking for money that was believed to be at the house.  Veal indicated that Bell was a shooter at the incident, and that three other people were involved:  defendant, Perry, and Mason.[5]  A prosecution witness testified that Bell, Mason, Perry and defendant were all older Lincoln Park gang members, ages 36 or 37.  Bell and Mason (who had reputations as "shooters") were close friends, and defendant and Perry were close friends.

Veal also told Detective Barnes that the people involved in the Velma Terrace incident were now " 'feuding with each other over this,' " explaining that Perry and Mason were "shooting at each other" over the incident.  Corroborative of this claim, the

---

[4]    Veal was called to testify at trial but recanted the recorded statements he made to Detective Barnes concerning the incident.

[5]    Detective Barnes testified that during the interview with Veal he was taking notes and he wrote down the names of the four persons Veal identified as being involved in the Velma Terrace incident; Veal pointed to Bell's name when the detectives asked him who the shooter was; and Veal also indicated that Bell was the person who told him about the incident.  When asked if Bell was the only shooter, Veal responded, "I can't say if he's the only shooter.' "
        The record on appeal does not include the actual recorded interview that was played for the jury, although it includes a transcript that was provided to the jury but not admitted into evidence.  As set forth in the transcript, the detectives asked Veal, "who talked to you about that one [Velma Terrace]?  I mean, I know a lot of people heard and talked and they just say . . . ."  Veal responded, ". . . I talked to him a little—he ain't gonna talk about it.  I've talked to him about it, but he don't want to . . . [¶] . . . [¶] . . . 'cause . . . it was so dumb that they didn't get no money, they try not to talk about it."  On cross-examination, Barnes acknowledged that although it might be confusing when viewing the transcript on its own as to how Veal acquired information about the Velma Terrace shooting, it was clear at the interview that Veal was saying he acquired the information from Bell.

15

authorities learned about several incidents that occurred in 2007 during which it appeared that Mason was threatening and/or shooting at defendant and Perry.

In June 2007, defendant's mother contacted the police and reported that defendant received a letter and voicemails from Mason in which Mason accused defendant of being a "snitch" and stated Mason was going to kill defendant, and Mason demanded money while he was absconding from the authorities and threatened to harm defendant or his family if he did not help. Defendant's mother was afraid of Mason because she knew he had committed a murder on Thanksgiving in 2005 (an apparent reference to the Velma Terrace murders). When defendant's mother suggested to defendant that they contact the police, defendant became upset, said he did not want to be a snitch, threw their phone out the window, and began throwing objects in the house.

On August 6, 2007, the police were summoned to the scene of a shooting at Perry's sister's home. Witnesses reported that a motorist fired a gun at two males standing outside the home, and the males fired back at the motorist. A bullet found by the front door of the residence matched a gun tied to Mason by DNA evidence, and the description of the motorist's vehicle matched a vehicle being used by Mason. Based on their investigation, the authorities believed the intended victims of the shooting were Perry and defendant.

The next day, August 7, 2007, the police received phone calls about gunshots in a Lincoln Park neighborhood. While the police were investigating a residence identified in one of the phone calls, defendant came out of the residence (his grandmother's home). Defendant said he heard gunshots but his house had not been hit. Defendant and the

16

police discussed several bullet holes that were in the exterior wall of the residence, and defendant and his grandmother told the police the holes happened a long time ago. Later in 2008, while the Velma Terrace case was still under investigation, the police extracted bullets from the exterior wall of the grandmother's home and forensic testing showed the bullets matched the gun tied to Mason by DNA evidence.

*Gang Experts' Testimony*

The prosecution gang experts testified that in gang culture fear and intimidation play a significant role by allowing the gang to exercise control. The gangs create fear in the community, in rival gang members, and in members of one's own gang. Also, respect is "everything" in gang culture and disrespect displayed by one gang member towards a fellow gang member is treated "[s]everely," including by shooting and murder. A gang member who has been disrespected by another gang member (whether from a rival gang or the same gang) must retaliate or he will be viewed as weak and lose status in the gang.

In the Lincoln Park gang, there are different generations of gang members; there are rules that the members must abide by; and if members do not abide by the rules and disrespect other gang members, the disrespected members must "take care of business." Members of the same gang may fight each other to try to fix the problems and come to a truce, and if this does not work, depending on the nature of the disrespect, the altercation may go "all the way up to death." The experts explained that although it was not usual to have the type of extreme violence between people associated with the same gang as occurred in the Velma Terrace murders, this type of activity does happen, and resolving

17

internal gang issues in a violent manner brings "authority to the gang" in the same manner as external gang violence brings authority between rival gangs.

A gang expert also testified that if Lincoln Park gang members are making money from drug dealing or robberies or theft, they are expected to give some money back to the gang. If a gang member hordes the money for himself, this will create issues that need to be dealt with. Also, if a younger drug-dealer gang member responds to "taxing" efforts of an older gang member by shooting at the older gang member, this would be a sign of disrespect that would require the older gang member to shoot back and kill the younger member. The expert opined that the Velma Terrace crimes were committed in association with and for the benefit of the Lincoln Park gang, based on the showing that Lincoln Park gang members committed the offenses and they had a motive to commit them because another gang member was not giving money back to the gang.

*Defense*

To refute the prosecution's evidence that Bell had identified defendant as one of his accomplices, the defense called retired detective John Tefft as a witness. The day after Detective Barnes interviewed Veal, Tefft (who was working as a cold case homicide detective) also interviewed him.[6] Tefft testified that Veal told him he acquired information about the Velma Terrace incident from people who came to his house and while he was in jail. Veal said he had a conversation with Bell, and Bell told him that he

---

[6] Detective Tefft took notes during the interview but apparently did not record it. When he interviewed Veal, Tefft knew that Veal had provided information about various cases to the detectives who arrested him the previous day, but Tefft did not know anything about what Veal had told the detectives.

18

and some other people were at the Velma Terrace house looking for a "huge stash of cash" but did not find it; they went to another house but again did not find the money; and "the murders happened after that." Veal told Tefft that this was the only information he received from Bell, and he learned through "various rumors" from " 'other people' " that the persons who were involved in the incident with Bell were defendant, Mason, and Perry.

To rebut the prosecution's DNA expert testimony, defense DNA expert Suzanna Ryan testified that it was not possible to determine with any certainty when each contributor's DNA was deposited at the bathroom door bloodstain. Further, she testified that she observed differential degradation in the DNA samples, and that McGhee's DNA was not degraded to the same degree as defendant's DNA. She opined that because the degradation of defendant's and McGhee's DNA was not consistent, and because one of the things that causes degradation is the passage of time, it was possible that defendant's sample was on the door for a longer time than McGhee's. Further, she testified there was no scientific support for an assessment that defendant's DNA would have been less strong and more degraded if it had been placed on the door several months before the crime. Also, she agreed that ZZ's DNA was substantially more degraded than McGhee's and defendant's DNA in the bloodstain, but opined there was no way to determine why there was this difference, and she noted ZZ's DNA could have been more degraded because the different areas of the door may have been subjected to different amounts of cleaning.

The defense also presented testimony from ZZ, who stated that he was "best friends" with defendant's cousin Purvis; he had a good relationship with defendant and

19

spent a lot of time with him; he at times gave defendant money and defendant was protective of him; a couple of times defendant intervened with the problems that ZZ had with other Lincoln Park gang members because of his money; and defendant let him move into his apartment after his father was killed.

Regarding Rouse (the older Lincoln Park gang member from a different faction than defendant's faction), ZZ testified that defendant told him not to meet with Rouse but if he did so to be careful; when ZZ did meet with Rouse defendant was in the vicinity watching to "make sure nothing happened"; and ZZ got into a car with Rouse even though defendant had told him not to do so for his own protection. Rouse told ZZ not to trust defendant, but defendant never did anything that made ZZ feel uncomfortable.

ZZ stated defendant was not happy he was working with Rouse, but claimed defendant's objection was because it was not in ZZ's best interests. ZZ denied he was trying to decide between protection from defendant or Rouse; claimed he was still friends with defendant when he was working with Rouse; and denied defendant wanted his keys back to his apartment because of ZZ's decision to work with Rouse.

ZZ lived in defendant's apartment for about two and one-half months, and then returned to live at the Velma Terrace house. Before his arrest in March 2005, defendant was around him "quite a bit at that time" and defendant visited him at the Velma Terrace house on several occasions. In early March before ZZ's arrest, ZZ gave defendant $3,000 cash for his birthday.

*Jury Verdict and Sentence*

Defendant was convicted of the first degree murders of McGhee and Newbern based on a theory of felony murder during the commission of a burglary or attempted robbery. He was also convicted of burglary; attempted robbery; false imprisonment of Newbern, McGhee, Stacey, Preston, and Hana; and possession of a firearm by a felon. True findings were made on gang enhancement allegations, special circumstance allegations, firearm use allegations, and prior serious felony and strike allegations. The court sentenced defendant to two terms of life without parole, plus an indeterminate term of 75 years to life, and a determinate term of 36 years and two months.

## DISCUSSION

I. *Sufficiency of Evidence To Establish Defendant as One of Perpetrators*

Defendant argues there was insufficient evidence for the jury to find beyond a reasonable doubt he was one of the intruders at the house at the time of the murders. In support, he claims (1) the evidence of his DNA on the bathroom door provides no support for the verdict because the experts could not conclusively determine his DNA was placed on the door at the time of the crimes as opposed to an earlier date, and (2) the evidence of Bell's hearsay statement to Veal identifying defendant and Bell as two of the perpetrators provides no support for the verdict because the statement was not admissible as a declaration against Bell's penal interest.[7]

---

[7] The testimony concerning Bell's identification of defendant involved two layers of hearsay: Bell's statement to Veal, and Veal's statement to Detective Barnes. Defendant focuses his challenge on Bell's hearsay statement to Veal, and he does not present any

21

We shall first evaluate defendant's claim that Bell's statement identifying defendant and himself as perpetrators was not admissible as a declaration against Bell's penal interest, and then evaluate the bathroom door DNA evidence and the overall sufficiency of the evidence to support that defendant was involved in the Velma Terrace crimes.

A. *Admission of Bell's Statement Identifying Himself and Defendant*

*as Declaration Against Penal Interest*

Under the declaration against penal interest exception to the hearsay rule, a declarant's statement is admissible "if the declarant is unavailable as a witness and the statement, when made . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) In addition to being against the declarant's penal interest, the statement must be "sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 611.)

To qualify as a statement against penal interest, the statement must be specifically disserving to the declarant; thus, any portions of the statement that are self-serving to the declarant must be excised from the statement. (*People v. Duarte, supra*, 24 Cal.4th at pp. 611-612.) To the extent the declarant attempts to " 'shift blame or curry favor,' " these aspects of the statement are not disserving. (*Ibid*.) Also, collateral statements that contain self-serving information cannot be deemed credible merely because they are

developed argument concerning Veal's hearsay statement to Detective Barnes. Veal testified at trial, whereas Bell did not.

22

incorporated in an admission of criminal culpability. (*Ibid*.) Thus, a statement " 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others)' " is generally not trustworthy. (*Id*. at p. 612; see *People v. Campa* (1984) 36 Cal.3d 870, 883 [indicia of reliability lacking where declarant " 'blamed a coparticipant for the commission of the greater offense while admitting complicity to some lesser degree' "].)

In *Lilly v. Virginia* (1999) 527 U.S. 116, the United States Supreme Court provided guidance on the showing required to constitutionally permit admission of a hearsay statement from a nontestifying accomplice that inculpates both the accomplice and the defendant. *Lilly* explained, " '[W]hen one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination.' " (*Id*. at p. 132.) The *Lilly* court stated that when an accomplice's inculpatory statements "shift or spread the blame" to a defendant, the statements fall outside the realm of firmly rooted hearsay exceptions that apply to hearsay that is so inherently trustworthy as to satisfy the confrontation clause. (*Id*. at pp. 126, 133-134.) Accordingly, to satisfy constitutional confrontation clause requirements, an accomplice's hearsay statements that inculpate both the accomplice and the defendant are only admissible upon a showing of " 'particularized guarantees of trustworthiness' "; i.e., when the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility. (*Id*. at pp. 125, 136.) In *Lilly*, the declarant admitted some participation in the charged crimes, but claimed the defendant

23

was the mastermind and the one who instigated a carjacking and committed a shooting, whereas the declarant had nothing to do with the shooting. (*Id*. at pp. 120-121.) The *Lilly* court concluded this trustworthiness test was not met because the circumstances showed the declarant made the statements in a custodial setting in response to police questioning and he had a natural motive to exculpate himself as much as possible. (*Id*. at p. 139.)

Consistent with *Lilly*, California courts have concluded that when a declarant makes a statement inculpating himself and the defendant, but with no attempt by the declarant to shift blame or minimize his responsibility, the entire statement may be admitted provided there is a clear showing that the statement was made under circumstances showing its trustworthiness. (*People v. Samuels* (2005) 36 Cal.4th 96, 120-121; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400-1401; *People v. Arceo* (2011) 195 Cal.App.4th 556, 576-577; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 174-175; see *People v. Schmaus* (2003) 109 Cal.App.4th 846, 859.) To determine trustworthiness, the court may consider not only the words used, but also the circumstances under which they were made, the possible motivation of the declarant, and the declarant's relationship to the defendant. (*People v. Duarte, supra*, 24 Cal.4th at p. 614.)

In *Samuels*, the declarant told a friend that he and another individual had committed a murder; the defendant paid the declarant for this; and the declarant skimmed money off the top of this payment and provided the balance to the person who assisted him with the murder. (*People v. Samuels, supra*, 36 Cal.4th at p. 120.) The *Samuels*

24

court concluded the entire statement was admissible, explaining: "[the declarant's] facially incriminating comments were in no way exculpatory, self-serving, or collateral. . . . [The declarant's statement that defendant paid him], volunteered to an acquaintance, was specifically disserving to [the declarant's] interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of circumstances presented here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged . . . . Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id*. at pp. 120-121.)

In *Arceo*, the declarant "bragged" to friends about his and the defendant's joint involvement in two murders, describing how he killed one victim and was going to shoot the second victim, but at defendant's request he handed the gun to the defendant and the defendant shot the second victim. (*People v. Arceo, supra*, 195 Cal.App.4th at p. 576.) *Arceo* found the entire statement admissible, reasoning that the declarant's statements describing his intent to shoot the second victim and defendant's taking over of this shooting "clearly subject[ed] [the declarant] to criminal liability for the second murder." (*Id*. at p. 577.) Also, the statements were made under circumstances showing their trustworthiness, including that they were made in a conversation between friends in a noncoercive setting and with no attempt to shift blame. (*Ibid*.; accord *People v. Arauz, supra*, 210 Cal.App.4th at p. 1401 [sufficient indicia of trustworthiness reflected in declarant's jailhouse statement to perceived gang associate bragging that declarant drove

25

defendants to scene where defendants shot victim]; *People v. Cervantes, supra*, 118 Cal.App.4th at pp. 167, 169-170, 174-176 [sufficient indicia of trustworthiness in declarant's statement to friend that either declarant or defendant shot one victim, and both declarant and defendant shot second victim; although declarant attributed blame to defendant he "accepted for himself an active role in the crimes"].)

On appeal, we review the trial court's evidentiary ruling for abuse of discretion, but independently determine the trustworthiness requirements for purposes of the confrontation clause. (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1217-1218; *People v. Cervantes, supra*, 118 Cal.App.4th at pp. 174-175; *People v. Schmaus, supra*, 109 Cal.App.4th at p. 857; see *People v. Brown* (2003) 31 Cal.4th 518, 536, 538.)

Here, the record shows Bell stated that he was a shooter during the Velma Terrace incident, and that defendant and two other Lincoln Park gang members were also involved. This statement clearly inculpated Bell in the crimes, and did not seek to shift blame or minimize his culpability. To the contrary, Bell was taking a high level of responsibility by admitting that he acted in concert with other gang members, including defendant, and that he was an actual shooter. Also, the fact that Bell made these statements to a fellow Lincoln Park gang member (Veal) creates significant indicia of trustworthiness because Bell was speaking to someone he trusted as a gang cohort. (*People v. Cervantes, supra*, 118 Cal.App.4th at p. 175 [" 'the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures' "].) There are no facts suggesting that Bell had any reason to be anything but completely truthful when speaking to a fellow gang member

26

about who was involved in the crimes. Further, Bell was talking with Veal about a crime scenario that involved multiple perpetrators; all of the accomplices he identified were older members of the gang who could have been at odds with the younger members; and two of the accomplices he identified (Mason and defendant) were tied to the crime scene by DNA evidence and (for Mason) by eyewitness identification. Considering the totality of circumstances supporting that Bell's statement contained no self-serving aspects, was made in a conversation with a member of the same gang, and was consistent with known circumstances of the crime scenario, the trial court did not err in finding the entire statement was trustworthy and properly admissible under the declaration against penal interest exception.

Finally, the evidence did not have to be excluded merely because the defense presented evidence from Detective Tefft who, contrary to Detective Barnes's testimony, stated that Veal indicated that the source of his information concerning defendant's identity as a perpetrator was from rumors, not from Bell. The jury viewed the video recording of Detective Barnes's interview with Veal, and Barnes testified that it was clear that Veal was saying he acquired the information from Bell. (See fn. 5, *ante*.) This evidence was sufficient to support that Bell made the statement identifying defendant, and the court did not abuse its discretion in allowing the jury to consider this identification evidence and make its own decision concerning its credibility and weight.

B. *Sufficiency of the Evidence that Defendant Was a Perpetrator*

To support his challenge to the sufficiency of the evidence, defendant argues the bathroom door DNA evidence carried no evidentiary weight because it could not be

27

definitively proven that his DNA was deposited at the residence at the time of the criminal events.

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) It is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts and inconsistencies, and we presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*; *People v. Young* (2005) 34 Cal.4th 1149, 1175, 1181.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Nelson, supra*, at p. 210.)

Although the prosecution experts could not conclusively establish that defendant's DNA was deposited during the crimes, they opined that several factors supported it had been deposited at or near the same time as the victim's DNA. They explained that if the DNA had been deposited at different times, they would have expected to see significant differences in degradation between the two samples, and there were no such differences. Further, DNA that is deposited from merely touching an object (as opposed to DNA deposited from source material such as blood and/or in a moist environment) tends to be a lesser level DNA, and the experts opined if defendant's DNA had been mere touch DNA it would have been at a lower level.

The experts also stated that because DNA from ZZ located a few inches from the bloodstain had degraded far more than the bloodstain DNA, this suggested ZZ's DNA had been deposited at an earlier time than McGhee's and defendant's DNA. Moreover, prosecution experts noted that touch DNA tends to be deposited when there is frequent contact with an object, and that a resident of a home tends to leave DNA throughout the home.

From this evidence, the jury could reasonably consider that if defendant had deposited his DNA when he visited ZZ eight months or more before the crimes, his DNA would likely have been similar in degradation to ZZ's DNA, whereas in fact it was very different from ZZ's and similar to the victim's in degradation. Also, the jury could deduce that because defendant never lived at the Velma Terrace house it was unlikely that he had left a large amount of touch DNA deposits at the residence, and it was highly significant that his DNA happened to show up at the exact spot where there was blood and the victim's DNA. These inferences support a reasonable conclusion defendant deposited his DNA on the bathroom door in the moist blood-laden environment that occurred during and immediately after the violent altercation with victim McGhee.

The fact that it could not be *conclusively* proven that defendant deposited his DNA at the time of the offenses did not preclude the jury from considering the prosecution experts' opinions on the matter as a relevant factor along with all the other evidence and to decide what weight to give the evidence. (See *People v. Jones* (2013) 57 Cal.4th 899, 941-942; *People v. Vernon* (1979) 89 Cal.App.3d 853, 869.) Further, this case is not in the same posture as the cases cited by defendant where the courts found insufficient

29

evidence to support the guilty verdict under circumstances where the *sole* evidence against the defendant was fingerprint evidence. Even if in some circumstances it might be appropriate to require a showing that fingerprints could have been impressed only at the time of the crime (see, e.g., *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353, 356-361), the circumstances of this case, which include evidence *in addition* to the DNA evidence, do not require such a definitive showing to support the jury's verdict.

Moreover, in the California cases cited by defendant, the courts evaluated *all* the circumstances to determine whether the fingerprint evidence was sufficient to convict, and they did not set forth a broad rule that no conviction can be upheld absent a showing that the fingerprints could have been deposited only at the time of the crime. (See, e.g., *Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 938 [only guesswork could support that defendant deposited her fingerprints at the time of crime on easily movable item at location available to public]; *People v. Atwood* (1963) 223 Cal.App.2d 316, 326-327 [noting that fingerprints on area normally inaccessible to others can reasonably support finding they were deposited at time of burglary]; *People v. Redmond* (1969) 71 Cal.2d 745, 756-757; *People v. Flores* (1943) 58 Cal.App.2d 764, 769-770; see also *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1077; *People v. Figueroa* (1992) 2 Cal.App.4th 1584, 1587-1588.)

Further, in addition to the DNA evidence, defendant's identification was supported by Bell's statement explicitly identifying defendant as a perpetrator, strong evidence of motive, and evidence of a postcrime feud between some of the identified perpetrators. As reflected in the phone wiretaps, defendant was angry with ZZ's decision to work with

30

Rouse's rival gang faction, and the jury could reasonably deduce defendant decided to join with fellow Lincoln Park gang members to retaliate against ZZ for his "disrespect" and to search for money that they believed ZZ had at the Velma Terrace residence. Also, there was evidence of a shooting-feud after the Velma Terrace crimes; Mason was identified as a perpetrator in both the Velma Terrace offenses and the shooting feud; and during the feud Mason accused defendant of being a snitch, threatened defendant, and shot at defendant's grandmother's home. From this evidence, coupled with the other evidence pointing to defendant as a Velma Terrace perpetrator, the jury could infer that Mason was trying to ensure that defendant did not talk to the police about the Velma Terrace crimes and that defendant had knowledge of the crimes because he was involved in them.

Considering all this evidence together, there is sufficient evidence to support the jury's finding that defendant was a perpetrator of the Velma Terrace offenses.

II. *Other Challenges*

A. *Challenge to Admission of Evidence Concerning DNA*

*on Hallway Doorframe*

In addition to the DNA evidence from the bathroom door bloodstain, over defense objection the prosecution introduced DNA evidence regarding a bloodstain (located across the hall from the bathroom) that was on the doorframe leading from the hallway to the living room. DNA testing of this hallway doorframe stain showed a DNA mixture from at least two people; the predominant DNA matched victim McGhee's DNA; and there were three other "low level DNA types." Prosecution expert Montpetit testified

31

that, apart from McGhee as the major contributor, he did not feel confident making any assessment about possible minor contributors because the three low level DNA types were too few in number and at too low a level. Nevertheless, when the prosecutor asked him to assume hypothetically that all three of the DNA types were from the same person, Montpetit testified that if he made this assumption, the testing would show that defendant was the only person of those tested who had all three of those DNA types, which suggested that "he could be included" in the sample.

However, Montpetit qualified his answer by stating, "for clarification . . . the fact that there's three DNA types, *I didn't feel confident making an assumption that they were all from a single person. And that's why I didn't make the comparison*." (Italics added.) On cross-examination, Montpetit reiterated that based on the fact that there were only three low level DNA types, he could not confidently assume there was only a single contributor; he could not make this assumption without the detection of more DNA markers; and hence the DNA sample was "*uninterpretable*." (Italics added.)

In closing arguments, the prosecutor referred to the hallway doorframe evidence, arguing that, although it could not be scientifically validated, common sense showed that—assuming there was only one contributor to the low level DNA—it supported defendant's guilt because defendant was the only one of the people tested who matched all three markers on this DNA sample. The prosecution acknowledged to the jury that "*yes, we're making some assumptions and those are up to you to find out if you disagree with me or are those unreasonable assumptions to make*." (Italics added.)

Defendant argues the trial court's admission of this testimony was an abuse of discretion and deprived him of a fair trial. He contends the evidence had little or no probative value; any minimal probative value was outweighed by the risk of prejudice and confusion; and admission of the evidence was prejudicial.

We agree the court should have excluded the evidence as irrelevant given prosecution expert Montpetit's testimony he was not confident accepting the prosecution's assumption the three low level DNA types were from the same person. Because this unfounded assumption was a necessary prerequisite for the claim the hallway doorframe DNA might have been tied to defendant, any inference associating this DNA with defendant was speculative and irrelevant. (*People v. Kraft* (2000) 23 Cal.4th 978, 1035 [evidence that provides merely speculative inferences is not relevant].)

However, on this record there is no basis for reversal. Reversal is not warranted for the erroneous admission of evidence unless an examination of the entire case shows the error resulted in a miscarriage of justice; that is, if it is reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (*People v. Nguyen* (2013) 212 Cal.App.4th 1311, 1333-1334.)

Viewing the record as a whole, Montpetit's testimony regarding the DNA evidence on the hallway doorframe was relatively brief, and he repeatedly and explicitly qualified his testimony by stating he did not feel confident making any assumption that there was only a single contributor to the low level DNA sample. The prosecutor acknowledged in closing arguments that the jury had to find that the assumption of a single contributor was reasonable, and the jury knew that the prosecution's own expert did not believe this

33

assumption was reasonable. Although the prosecutor urged the jury to find this piece of evidence supported its case against defendant, we are satisfied the jury recognized that it was of minimal significance given Montpetit's clear disclaimer of the required assumption. Under these circumstances, there is no reasonable probability the jury gave much weight to the evidence and its admission did not rise to the level of a miscarriage of justice requiring reversal.

Defendant argues the erroneous admission of the evidence also violated his federal constitutional due process rights, and the error was not harmless beyond a reasonable doubt. For the reasons stated above, the erroneous admission of the evidence did not rise to the level of a violation of the federal constitutional right to a fair trial (*People v. Nguyen, supra*, 212 Cal.App.4th at p. 1334), and in any event there was no prejudice even under the stricter harmless beyond a reasonable doubt standard.

B. *Challenges to Gang Enhancement*

Defendant argues the gang enhancement must be reversed because of instructional error and insufficiency of the evidence.

1. *Absence of Clarifying Instruction Regarding Meaning of "In Association With" Gang*

The gang enhancement applies to crimes that are "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (Pen. Code, § 186.22, subd. (b)(1).)[8] To establish the enhancement, the crime must be gang related.

---

[8] Subsequent unspecified statutory references are to the Penal Code.

34

(*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "Not every crime committed by gang members is related to a gang"; for example, an offense committed by gang members as part of " 'a frolic and detour unrelated to the gang' " is not gang related. (*Id.* at pp. 60, 62.) The gang-related requirement may be shown by evidence indicating that several defendants "came together as gang members" to commit the offense, or that the offense could benefit the gang by, for example, elevating the gang's or gang members' status or advancing the gang's activities. (*Id.* at pp. 62-63, italics omitted; see *People v. Gardeley* (1996) 14 Cal.4th 605, 619.)

Defendant argues the trial court was required to provide the jury with an instruction concerning the meaning of "in association with" a gang because this phrase has a technical legal meaning. The trial court must sua sponte instruct on the general principles of law governing the case which are necessary for the jury's understanding of the case. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1013.) The language of a statute defining a crime is generally a sufficient basis for an instruction. (*People v. Smithey* (1999) 20 Cal.4th 936, 980-981.) If the legal meaning of a statutory term differs from its meaning in " 'common parlance,' " the trial court should provide clarifying instructions. (*Id.* at p. 981.)

To support his position that "in association with" has a technical legal meaning in the gang enhancement statute, defendant extracts a statement from *Albillar* where the court concluded there was substantial evidence to support that three gang members committed a sexual attack on a young girl in association with their gang because the defendants "relied on their common gang membership and the apparatus of the gang in

35

committing the sex offenses against" the victim. (*Albillar, supra*, 51 Cal.4th at p. 60.) Contrary to defendant's claim, *Albillar* does not state that "in association with" is a technical phrase meaning reliance on common gang membership and the gang apparatus. *Albillar*'s statement in this regard was made in the context of discussing the sufficiency of the evidence, not the meaning of the phrase for instructional purposes. The *Albillar* court found sufficient evidence to establish the association component based on a variety of factors, including expert testimony concerning the advantages of gang members committing crimes together rather than individually and the specific facts of the case showing the gang members helped each other complete the offenses and gang associates helped them avoid detection. (*Id.* at pp. 61-62.)

When reaching this conclusion, *Albillar* did not suggest that it was setting forth a definition of acting in association with a gang that is distinct from its commonly understood meaning. Rather, the court was evaluating whether the evidence could support that the defendants "came together as gang members" to attack the victim rather than engaging in a " 'frolic and detour unrelated to the gang.' " (*Albillar, supra*, 51 Cal.4th at pp. 61-62.) As defined in a standard dictionary, to "associate" means "to join as a partner, friend, or companion" or "to come or be together as partners, friends, or companions." (Merriam-Webster's 10th Collegiate Dictionary (2002), p. 70.) Based on its commonly understood meaning, the jurors would have known that acting "in association with" a gang meant that the defendants must have joined together as gang members, not merely as individuals who were engaging in conduct unrelated to their gang.

Defendant's citation to the dissenting opinion in *Albillar* likewise does not establish that "in association with" has a technical meaning requiring sua sponte clarification. Disagreeing with the majority's conclusion concerning the sufficiency of the evidence, the dissent reasoned that acting in association with a gang meant acting with the gang as an *organization*, not merely acting in association with gang members, and there was no evidence that the gang as an organization was involved in or aware of the crimes until after they were committed and, to the contrary, the evidence showed the gang disapproved of sexual assaults. (*Albillar, supra*, 51 Cal.4th at pp. 72-73 (dis. opn. of Werdergar, J.).) To the extent the dissent characterized the majority as having defined "in association with" as meaning reliance on common gang membership and the gang apparatus, this was in the context of discussing its disagreement with the majority's definition which focused on gang members associating with one another rather than associating with the gang as an organization. (*Ibid.*) Even assuming the dissent viewed the majority opinion as setting forth a definition of "in association with" that should have been provided to the jury, there is nothing in the majority opinion that indicates this was required.

Finally, we are not persuaded by defendant's contention that reversal of the gang enhancements is required because the prosecution gang expert's testimony and the prosecutor's closing argument suggested that gang members acting together automatically shows the crimes were committed "in association with" a gang. Assuming (without deciding) the testimony or argument might have misled the jury, there was no prejudice. Even applying the stricter standard applicable to federal constitutional error, there is no

37

reasonable possibility the outcome might have been more favorable to defendant had the association element been clarified for the jury. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 320, 326-327.) As we shall delineate below when addressing defendant's challenge to the sufficiency of the evidence to support the gang enhancements, there was compelling evidence that the criminal activity in this case was gang related. Under these circumstances, there is no reasonable possibility the jurors might have found the offenses were not committed in association with the gang or for the benefit of the gang even if they had been told the perpetrators' shared gang membership does not automatically establish the gang association component of the enhancement.

## 2. *Sufficiency of Evidence for Gang Enhancement*

Defendant argues there was insufficient evidence to show that the crimes were committed for the benefit of, at the direction of, or in association with a gang, rather than to advance the personal interests of a particular faction of the gang. The contention is unavailing.

The record fully supports the jury's finding that the offenses were gang related. The jury could reasonably find that the offenses were committed by older Lincoln Park gang members who were angry at a younger Lincoln Park gang member who was not giving back money to the gang from his drug dealing and not following the dictates of the older gang members. Prosecution gang experts testified that gangs survive by having members give money back to the gang; it is expected that members who earn money will use that money to help support other gang members; and when a gang member disobeys these gang rules, this is an act of disrespect that must be sanctioned. The jury was

38

presented with evidence supporting that Lincoln Park gang member ZZ was earning large sums of money as a drug dealer; he was not paying money back to the gang; he shot at one of the older gang members (Bell) who had ordered him to provide drugs; Bell in turn shot ZZ's father; ZZ disobeyed the directions of another older gang member (defendant) on how to deal with a rival faction in the gang; and a group of gang members, including defendant and Bell, descended upon a house associated with ZZ in an attempt to find a large amount of money they thought ZZ had placed there and when they could not find it they killed ZZ's brother and the brother's girlfriend.

From this evidence, the jury could reasonably find the events at the Velma Terrace house were designed to enforce the gang rules and protect the interests of the gang by keeping its members under control and compliant with the wealth-sharing requirement, and to thereby ensure the survival of the gang as an intact group capable of carrying out its criminal activities.

C.  *Challenge to Expert Opinion Testimony on Gang Association Element that Assumed Defendant Was a Perpetrator*

Defendant argues that through trial court error and prosecutorial misconduct, he was deprived of his jury trial right when prosecution expert Detective Rudy Castro opined that the crimes were committed in association with a gang because they were committed by defendant, Mason, and Bell.  He asserts this testimony identifying him as a perpetrator equated with the provision of a directed verdict to the jury.

During examination by the prosecutor, Detective Castro testified that he was not involved in the investigation of the Velma Terra crimes, but he reviewed the information

39

gathered by Detective Barnes, including about who "*might be involved*." (Italics added.) After eliciting this testimony, the prosecutor asked Castro if he had an opinion whether the crimes were committed in association with the Lincoln Park gang. Castro responded yes, explaining that the *basis for his opinion was the "association that [defendant], who he was with, with . . . Michael Mason and Terrill Bell*." (Italics added.) Defense counsel objected that there was no foundation showing a connection between the three individuals, and the court overruled the objection.

Assuming the trial court should have sustained defense counsel's objection to the manner in which the expert responded to the question, there was no prejudice. Immediately after the trial court overruled the objection, the prosecutor asked the expert: "If I can sort of ask you another question. [¶] Do you believe that there were—whether or not individuals—because obviously . . . you weren't present there . . . [¶] . . . [¶] . . . Is your opinion based upon the review of what occurred at the Velma Terrace home in 2005, is your opinion that those crimes were committed *by one or more Lincoln Street gang members*?" (Italics added.) The expert responded "Yes," and the prosecutor then asked, "And is that the basis of your giving us the opinion that . . . those crimes were done in association with the Lincoln Park street gang?" The expert again responded "Yes."

It is apparent from this line of questioning that once defense counsel made his objection, the prosecutor directed the questioning in a manner that did *not* name defendant as one of the perpetrators but rather generally referred to Lincoln Park gang members. Also, at the inception of the questioning, the prosecutor's question and the

40

expert's testimony used language referring to who *might be* involved, not who was proven to be involved. Further, there is no doubt the jury understood from the manner in which the case was presented to them—including the witness examination and closing arguments—that the primary dispute at trial was whether the prosecution had proven beyond a reasonable doubt that defendant was one of the perpetrators.

On this record, there is no reasonable possibility the jury construed the expert's single statement referring to defendant as one of the perpetrators as the equivalent of a statement telling them how to decide the pivotal issue of identity. We assume jurors are reasonably intelligent (*People v. Butler, supra*, 187 Cal.App.4th at p. 1013), and reasonably intelligent jurors would have understood the expert was saying that *if* they found defendant and other Lincoln Park gang members were the perpetrators, in the expert's view this was a factor supporting the association component of the alleged gang enhancement.

## D. *Cumulative Error*

Defendant argues the cumulative effect of the errors deprived him of a fair trial and requires reversal. Even viewed cumulatively, none of the errors that we have identified rises to this level. The actual or possible errors included the admission of the DNA doorframe evidence that had no relevancy because of the unfounded assumption that it came from a single contributor; the statements by a prosecution expert and the prosecutor suggesting that multiple gang members' commission of a crime together automatically establishes the association component for the gang enhancement; and the prosecution expert's brief reference to defendant as a perpetrator when testifying

41

regarding this association component. Viewing the trial as a whole, these errors were minor. For the reasons stated in our analysis of each of these matters, there is no reasonable possibility they affected the jury's verdict even when considered together.

### III. *Challenge to Special Circumstances*

Defendant challenges the constitutionality of three special circumstances found true in his case: (1) the multiple murder special circumstance, (2) the prior murder special circumstance, and (3) the felony murder special circumstance.

### A. *Multiple Murder and Prior Murder Conviction Special Circumstances*

Section 190 permits a sentence of death or life without the possibility of parole if the defendant is convicted of first degree murder in the current proceeding, and the defendant committed more than one first or second degree murder in the current proceeding (§ 190.2, subd. (a)(3)) or if the defendant has been previously convicted of first or second degree murder (§ 190.2, subd. (a)(2)).

Raising a substantive due process claim, defendant contends these special circumstances are overbroad and create an irrational sentencing scheme because they focus on the results of the defendant's actions (multiple deaths) rather than on the defendant's mental state, and thereby apply to a broad class of persons of many different levels of culpability.

The California Supreme Court has repeatedly rejected challenges to the constitutionality of the multiple murder and prior murder conviction special circumstances. (*People v. Thomas* (2012) 53 Cal.4th 771, 818; *People v. Sapp* (2003) 31 Cal.4th 240, 286-287; *People v. Boyette* (2002) 29 Cal.4th 381, 440; *People v. Lucero*

42

(2000) 23 Cal.4th 692, 740-741; *People v. Gurule* (2002) 28 Cal.4th 557, 637.) In these decisions, the court has explicitly rejected the claims made by defendant. (See, e.g., *People v. Sapp, supra*, at p. 287; *People v. Boyette, supra*, at p. 440; *People v. Lucero, supra*, at p. 740.) As stated in *Lucero*: "[T]he multiple-murder special circumstance focuses on a narrow group of killers: only those who have murdered more than one person. . . . One who is mentally prepared to commit repeated acts of murder, or to commit a murderous act that results in the death of two or more persons, is more dangerous to society and more deserving of the ultimate punishment than one who has killed once." (*Lucero, supra*, at p. 740.)

In support of his position, defendant cites reasoning in *Sapp*, which states that the multiple murder special circumstance narrows the class of death-eligible first degree murderers to "those who have killed and killed again . . . ." (*People v. Sapp, supra*, 31 Cal.4th at p. 287.) He posits that the multiple/prior murder special circumstances can be properly imposed only in cases where the defendant has committed multiple acts of murder, and not as here, where the murders arose from a single incident. This contention would typically be inapplicable to the prior murder conviction special circumstance. Further, our high court has upheld the constitutionality of the multiple murder special circumstance in cases where the murders all occurred during a single transaction. (*People v. Boyette, supra*, 29 Cal.4th at pp. 404, 440 ["categorizing as especially deserving of the ultimate penalty those offenders who kill two or more victims *in one criminal event* is not arbitrary, unfair or irrational," italics added]; see, e.g., *People v. Souza* (2012) 54 Cal.4th 90, 102, 141 [multiple victims shot at apartment]; *People v.*

*Lucero, supra*, 23 Cal.4th at pp. 708-710.) Moreover, when, as here, the murder victims were killed by distinct acts of shooting, the defendant has, indeed, killed and killed again, albeit during the same incident.

Defendant's constitutional challenge to the multiple murder and prior murder conviction special circumstances is unavailing.

### B. *Felony Murder Special Circumstance*

Defendant argues the felony murder special circumstance is unconstitutionally vague because it fails to distinguish between the offense of first degree murder based on a murder committed during the commission or attempted commission of a statutorily-enumerated felony (§ 189), and the special circumstance providing for a sentence of death or life without the possibility of parole when the murder is committed during the commission or attempted commission of a statutorily-enumerated felony. (§ 190.2, subd. (a)(17).)

Defendant recognizes that we have rejected a constitutional vagueness challenge to the felony murder special circumstance in *People v. Andreasen* (2013) 214 Cal.App.4th 70, 79-82, but contends our decision overlooked relevant judicial authority. In *Andreasen*, we evaluated the relevant statutes and concluded they provided notice that if the defendant commits a specified felony and kills during the felony, he could be subjected to a sentence of 25 years to life (felony murder) or life without parole or death (special circumstance felony murder), and the fact that the prosecution has discretion to select which punishment it will seek does not make the statute unconstitutionally vague or arbitrary. (*Id*. at p. 80.) We also held that assuming constitutional due process

44

requires a distinction between felony murder and the felony murder special circumstance, this distinction exists because the special circumstance requires a distinct showing that the felony was not merely incidental to the murder; i.e., that the defendant had an independent or concurrent intent to commit the felony and did not commit the felony for the sole purpose of effectuating the killing. (*Id*. at pp. 80-82; compare CALCRIM No. 730 [felony-murder special circumstance requires proof that defendant intended to commit felony independent of the killing, and it is not proven if defendant only intended to commit murder and felony was merely part of or incidental to murder] with CALCRIM No. 540B [felony murder, with no mention of felonious intent independent of killing].)

Defendant argues our holding in *Andreasen* that there is a distinction between felony murder and the felony murder special circumstance fails to recognize judicial decisions stating that felony murder requires that the killing occur during the commission of the felony. (See *People v. Thompson* (2010) 49 Cal.4th 79, 115; *People v. Huynh* (2012) 212 Cal.App.4th 285, 307-308 [killing and felony must be part of one continuous transaction].) To the contrary, *Andreasen* recognizes that both felony murder and the felony murder special circumstance require a killing that occurs during the commission of a felony, and then explains that for felony murder there is no need to " 'plumb the parties' peculiar intent' " apart from the intent to commit the felony, whereas the felony murder special circumstance requires an additional showing that the defendant had a stand-alone purpose for committing the felony rather than merely using the felony as a means to carry

45

out the killing.  (*People v. Andreasen, supra*, 214 Cal.App.4th at pp. 80-81 [e.g., special circumstance inapplicable if defendant had no purpose for arson apart from murder].)

For the reasons stated in *Andreasen*, defendant's constitutional challenge to the felony murder special circumstance fails.

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


McINTYRE, J.

46